**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MPEG LA, L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| ODS OPTICAL DISC SERVICES, INC., | ) **JURY TRIAL DEMANDED** |
| (f/k/a ODS BUSINESS SERVICES, INC.), and | ) |
| ODS BUSINESS SERVICES, LTD. | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AND JURY DEMAND

Plaintiff MPEG LA, L.L.C. ("MPEG LA" or "Company"), by and through its

undersigned counsel, for its complaint in this action, alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for a permanent injunction, declaratory judgment and

damages by MPEG LA, which administers sublicenses under patents to manufacture

devices and replicate discs incorporating MPEG-2 digital compression technologies,

against  ODS Optical Disc Service, Inc., f/k/a ODS Business Services, Inc. ("ODS DSI")

and ODS Business Services, Ltd. ("ODS BSL") (collectively the "ODS Affiliates"),

companies which replicate discs using the MPEG-2 digital compression technologies.

MPEG LA seeks injunctive relief and damages pursuant to section 43(a) of the Lanham

Act, a declaratory judgment that the ODS Affiliates are not licensed, and other relief this

Court deems appropriate.

2.      Since ODS Optical Disc Service GmbH ("ODS") was adjudicated an

infringer of the MPEG-2 digital compression technologies by a specialized court in

Germany, ODS has failed to become licensed through the individual patent holders who

have patents essential to the practice of the MPEG-2 digital compression technologies or through MPEG LA, which offers a sublicense for all of the patents that ODS was adjudicated to infringe and others that read on MPEG-2 digital compression technologies (the "License"). Instead, on information and belief, ODS and/or its corporate affiliates continue to willfully infringe these patents essential to the practice of the MPEG-2 digital compression technologies.

3.     ODS DSI, which is a corporate affiliate of ODS, has erroneously represented to MPEG LA and the marketplace that it has acquired a License from MPEG LA because it claims to have purchased Deluxe Media Services, Ltd. ("DMSL"), an entity located in Little Rock, Arkansas, who ODS DSI asserts, had an MPEG LA license for it to purchase. This has caused confusion in the marketplace and has harmed and continues to harm MPEG LA.

4.     ODS BSL, which is a corporate affiliate of ODS, has erroneously represented to MPEG LA and the marketplace that it has acquired a License from MPEG LA because it claims to have purchased Thamesdown SDC Limited ("Thamesdown"), a British entity which has been in bankruptcy administration in the United Kingdom since March 1, 2006, which ODS BSL asserts had an MPEG LA license for it to purchase. This has caused confusion in the marketplace and has harmed and continues to harm MPEG LA.

5.     These assertions are legally and factually inaccurate and cause harm to MPEG LA in the marketplace by, among other things, confusing potential licensees about how a corporate family can acquire a MPEG LA license and avoid the obligation to account for back royalties required to be paid by the licensee, as well as great

2

confusion to businesses seeking to replicate discs that require the use of MPEG-2 digital compression technologies through licensed vendors and who erroneously believe as a result of the ODS-created confusion that they can secure lawful replication with the ODS Affiliates.

6.     MPEG LA has provided notice to the ODS Affiliates that their allegations are incorrect yet the ODS Affiliates refuse to issue corrections to the marketplace and threaten to commence legal actions against MPEG LA for its efforts to correct this misrepresentation in the marketplace.

7.     The ODS Affiliates' false and misleading descriptions of fact or representations of fact which misrepresent the nature, characteristics or qualities of its services, specifically that they are licensed to practice MPEG-2 digital compression technologies, are material, literally false, misleading, and violate section 43(b) of the Lanham Act.

8.     In addition to injunctive relief pursuant to the Lanham Act, MPEG LA seeks a declaratory judgment against the ODS Affiliates finding that they did not become licensed through MPEG LA because of their alleged purchase of DMSI and Thamesdown or that if they did buy such Licenses, that MPEG LA has terminated such Licenses pursuant to their terms.  MPEG LA also seeks money damages, including interest, and injunctive relief in the form of an order requiring the ODS Affiliates to cease and desist releasing incorrect statements to the marketplace about the License.

## THE PARTIES

9.     MPEG LA is a limited liability company of Delaware having a principal place of business at 4601 Willard Avenue, Suite 200, Chevy Chase, MD 20815, USA.

10.   ODS DSI is a limited liability company of Delaware having a principal place of business at 9201 Faulkner Lake Road, North Little Rock, AR 72117, USA.

11.   ODS BSL is a limited liability company of the United Kingdom having a principal place of business at Frankland Road, Blagrove, Swindon, SN5 8YG, UK.

## JURISDICTION AND VENUE

12.   Jurisdiction is proper in this Court pursuant to Title 28 U.S.C. §§ 1331 and 1367.

13.   Personal jurisdiction and venue are proper in this Court because a substantial part of the events underlying the claims herein occurred and continue to occur in this Judicial District, and because ODS DSI (and its predecessor ODS Business Services, Inc.) is organized under the laws of the State of Delaware.

## MPEG LA'S LICENSING SERVICE

14.   MPEG LA administers non-exclusive sublicenses under patents to manufacture and practice, among other things, MPEG-2 digital compression technologies. MPEG LA was established in order to provide the marketplace with non-discriminatory access to as many of the patents which are essential to MPEG-2 technology as possible. MPEG LA has extended MPEG-2 licenses to more than 1,000 licensees located throughout the world.

15.   Through the MPEG LA licensing program, users of the MPEG-2 technology can license all patents offered by MPEG LA essential to practice the MPEG-2 technology in a single agreement. Alternatively and at their option, potential licensees can negotiate separate licenses to whichever essential patents they desire from individual patent owners.

4

16.    A condition of a company becoming licensed through MPEG LA is that it account for any and all back royalties it or its corporate affiliate owe to the patent holders for infringing conduct that occurred prior to the date it executes its license.  (*See* Exhibit A hereto, Standard MPEG-2 Patent Portfolio License at Section 3.3.2.)

17.    Upon information and belief, ODS owes millions of dollars in back royalties for its infringement of patents essential to the practice of MPEG-2 digital compression technologies that can be licensed through MPEG LA both before and since the time that it was adjudicated to have infringed certain licensed patents.

### ODS'S LONGSTANDING HISTORY OF INFRINGEMENT

18.    ODS Optical Disc Service GmbH has been in business of making DVD-Video discs at least since 2003.

19.    Before July, 2005 MPEG LA offered ODS Optical Disc Service GmbH an opportunity to enter into the MPEG LA MPEG-2 Patent Portfolio license.

20.    To date, ODS Optical Disc Service GmbH has refused to enter into the MPEG LA MPEG-2 Patent Portfolio license.

21.    In July, 2005, certain owners of patents in the MPEG LA MPEG-2 patent portfolio sued ODS Optical Disc Service GmbH, Wilhelm F. Mittrich, and Andreas Osthoff (collectively "ODS") for patent infringement in the Landgericht Düsseldorf court.

22.    The Landgericht Düsseldorf court is a German Federal Court specializing in patent infringement actions ("The German Court").

23.    On November 30, 2006, the German Court issued a verdict finding that ODS Optical Disc Service GmbH, Wilhelm F. Mittrich, and Andreas Osthoff

5

(collectively "ODS") infringe the German portion of European Patent 679316, owned by GE Technology Development, Inc. ("GETD").

24.     On November 30, 2006, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 599529, owned by Matsushita Electrical Industrial Co. Ltd. ("Matsushita").

25.     On November 30, 2006, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 683615 (DE publication no. 691 31 257), owned by Victor Company of Japan (JVC) Ltd. ("JVC").

26.     On November 30, 2006, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 260748, owned by Philips Intellectual Property & Standards Gesellschaft.

27.     On November 30, 2006, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 443676, owned by Koninlijke Philips N.V. ("Philips").

28.     On November 30, 2006, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 460751, owned by Koninlijke Philips N.V. ("Philips").

29.     On November 30, 2006, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 713340, owned by Sony Corporation ("Sony").

30.     On November 30, 2006, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 638218, owned by Sony Corporation ("Sony").

6

31. On November 30, 2006, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 573665, owned by Sony Corporation ("Sony").

32. On January 11, 2007, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 248711, owned by France Telecom Société Anonyme ("France Telecom").

33. On January 11, 2007, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 984635, owned by Mitsubishi Denki Kabushiki Kaisha ("Mitsubishi").

34. On January 11, 2007, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 844792, owned by Thomson Licensing Société Anonyme ("Thomson").

35. On January 11, 2007, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 630157, owned by The Trustees of Columbia University in the City of New York ("Columbia").

36. On January 11, 2007, the German Court issued a verdict finding that ODS infringes the German portion of European Patent 279053, owned by Robert Bosch GmbH ("Bosch").

37. Notwithstanding these findings that ODS's replication activities infringe MPEG-2 patents licensed in MPEG LA's license, ODS refuses to become licensed for its infringing activities through MPEG LA or the individual patent owners.

7

38.　ODS has been offered the opportunity to become licensed through MPEG LA on numerous occasions provided it complies with the terms of MPEG LA's standard license as that license has been applied to almost 1,000 licensees. It refused to do this.

### ODS BSL ATTEMPTS TO BUY A LICENSE

39.　Thamesdown SDC ("Thamesdown") became licensed through MPEG LA on October 29, 2005. Thamesdown went into bankruptcy administration on or about March 1, 2006. MPEG LA terminated the license as of March 1, 2006.

40.　On December 21, 2006, ODS BSL sent an email to MPEG LA advising that it had purchased "substantially all of the assets" of Thamesdown SDC. No substantiation was or has been provided for this claim.

41.　As a part of this acquisition, ODS BSL claimed it had been assigned the MPEG-2 Patent Portfolio License by Thamesdown for "consideration of One Pound (£1.00) from 9 March 2006."

42.　The License language makes plain that "[t]his Agreement may not be assigned by the Licensee" other than in limited and specific instances, including the purchase of "substantially all of the assets of Licensee." (*See* Exhibit A hereto at Section 7.1.) ODS BSI has completely failed to provide any credible information that it has purchased such assets of a licensee.

43.　On December 28, 2006, counsel for MPEG LA advised ODS BSL that: (i) it did not acquire a license by virtue of its alleged acquisition of Thamesdown; (ii) the Thamesdown license was terminated on March 1, 2006 pursuant to the terms of the License because of the fact that Thamesdown was in bankruptcy administration; and, (iii) to the extent ODS BSL believed it was licensed, MPEG LA would exercise its

8

unilateral right to terminate the license and would not approve the extension of any such license to ODS affiliates until back royalties have been paid.

44.    In a letter dated January 3, 2007, ODS BSL claimed that its affiliates ODS Mastering & Development GmbH and ODS Optical Disk Replication GmbH were licensees.

45.    Pursuant to the MPEG LA License, a licensee may elect to include its affiliates within the scope of the license if, and only if, it "notifies the Licensing Administrator within ten (10) Days of the grant of such new further sublicense, *and* the attachment entitled "Licensed Affiliates" is modified to include the new sublicensed Affiliate." (*See* Exhibit A at Section 2.9.2 (emphasis added).) This, of course, cannot be done without MPEG LA's acceptance. ODS BSL's claim that its affiliates are licensed is inaccurate.

### ODS BSL MISLEADS THE MARKETPLACE

46.    Notwithstanding this notice, ODS BSL commenced to falsely notify the marketplace through press releases and bilateral communications that it had secured a License through MPEG LA causing confusion to many licensees and their actual or potential customers.

47.    The substance of these communications was incorrect, ODS BSL knew it was incorrect, and it caused harm to MPEG LA in both legal fees it incurred and time spent it dedicated to addressing this erroneous statement in the marketplace. It also has damaged MPEG LA to the extent that those false claimse have caused disks to be made by ODS—which is infringing and not paying royalties—rather than made by licensed replicators which would then pay a fee to MPEG LA.

48.    MPEG LA responded to these statements with its own press release and by responding to queries initiated by its customers, clients and consumers as to whether ODS BSL's claims were correct.

49.    In various communications, ODS BSL threatened to commence legal actions against MPEG LA because of its efforts to correct ODS BSL's misstatements to the marketplace.

## ODS DSI ATTEMPTS TO BUY A LICENSE

50.    Deluxe Media Services, Inc. ("DMSI") became licensed through MPEG LA on November 11, 2004.

51.    On December 11, 2006, DMSI advised MPEG LA that it no longer sought to license its affiliates.  MPEG LA advised DMSI the next day that it had ratified this decision and no longer provided coverage to DMSI's affiliates under the License.

52.    In a letter dated January 2, 2007, ODS BSI (n/k/a ODS DSI) advised MPEG LA that as of December 21, 2006, it allegedly purchased "substantially all of the assets" of Deluxe Media Services, LLC ("DMSL").  No substantiation was or has been provided for this claim.  MPEG LA has been unable to verify this claim with DMSL.

53.    As a part of this alleged acquisition, ODS BSI claimed it had been assigned the MPEG-2 Patent Portfolio License by DMSI.  ODS BSI did not allege that it acquired the assets of DMSI.

54.    MPEG LA has never executed a license with a company named DMSL and DMSI never informed MPEG LA of any corporate name change.

55.    The License language makes plain that "[t]his Agreement may not be assigned by the Licensee" other than in limited and specific instances, including the

10

purchase of "substantially all of the assets of Licensee." (*See* Exhibit A hereto at 7.1.) ODS BSI (n/k/a ODS DSI) has completely failed to provide any credible information that it has purchased such assets of a licensee.

56.    In the letter dated January 2, 2007, ODS BSI also alleged that four affiliates of DMSL became affiliates of ODS BSI and are now sublicensed under the MPEG-2 License. In support of this claim, ODS BSI created sublicenses between it and these four companies that were prepared entirely by ODS BSI.

57.    In the letter dated January 2, 2007, ODS BSI also claimed that three pre-existing affiliates of ODS BSI, not acquired through the purchase of "substantially all assets of" DMSL, have also become sublicensed "effective December 21, 2006."

58.    In its letter dated January 8, 2007, MPEG LA explained that pursuant to the MPEG LA License, a licensee may elect to include its affiliates within the scope of the license if, and only if, it "notifies the Licensing Administrator within ten (10) Days of the grant of such new further sublicense, *and* the attachment entitled "Licensed Affiliates" is modified to include the new sublicensed Affiliate." (*See* Exhibit A at Section 2.9.2 (*emphasis added*).) This cannot be done under the terms of the license without MPEG LA's acceptance. ODS BSI's (n/k/a ODS DSI) claim that its affiliates are licensed is inaccurate.

59.    In a subsequent letter dated January 3, 2007, ODS BSI advised MPEG LA that it changed its name to ODS DSI and that ODS DSI acquired ODS BSI's interest in DMSL.

60.    On January 8, 2007, MPEG LA advised ODS BSI and ODS DSI that: (i) it did not acquire a license by virtue of its alleged acquisition of DMSL; (ii) that DMSL

11

did not have a MPEG LA License; (iii) that any affiliates of ODS BSI and ODS DSI were similarly not licensed; and, to the extent ODS BSI and (iv) ODS DSI persisted in its erroneous claim of being licensed, MPEG LA would exercise its unilateral right to terminate any such license and would not approve the extension of any such license to ODS affiliates.

## ODS ODS DSI MISLEADS THE MARKETPLACE

61.    Notwithstanding this notice, ODS DSI commenced to notify the marketplace through press releases and bilateral communications that it had secured a License through MPEG LA causing confusion to many customers of MPEG LA.

62.    For instance, in its press release dated December 28, 2006, ODS DSI stated that "[a]s part of the asset deal ODS has acquired the DVD manufacturing licenses issued by MPEG-LA" and that "the ODS Group's manufacturing operations in the US, the UK and in Germany have now agreed to be MPEG-LA … licensees for their entire DVD production."

63.    The substance of these communications was incorrect; ODS DSI  knew these communications were incorrect, and caused harm to MPEG LA in both legal fees it incurred, time spent it dedicated to addressing and correcting erroneous statements in the marketplace, and income it would have received as alleged in paragraph 47 above.

64.    MPEG LA responded to these statements with its own press release and by responding to queries initiated by its licensees and clients as to whether ODS DSI and ODS DSL's claims were correct.

65.    In various communications, ODS BSI and ODS DSI threatened to commence legal actions against MPEG LA because of its efforts to correct ODS BSI and ODS DSI's misstatements to the marketplace.

### COUNT ONE
### (VIOLATION OF THE LANHAM ACT SECTION 43(B))

66.    MPEG LA incorporates by reference the allegations set forth in paragraphs 1 through 65 of this Complaint as though fully set forth herein.

67.    The ODS Affiliates' false and misleading descriptions of fact or representations of fact which misrepresent the nature, characteristics or qualities of their services, are material, literally false, misleading, and violate section 43(b) of the Lanham Act.

68.    The ODS Affiliates' conduct is willful, deliberate, and in bad faith. MPEG LA explicitly warned the ODS Affiliates that their statements are false and misleading. The ODS Affiliates have chosen to ignore these warnings and continue with their deceptive statements.

69.    MPEG LA has been and is likely to continue being damaged in an amount to be determined by a jury at trial by the ODS Affiliates' false and misleading representations concerning the manner in which an infringer might secure a MPEG LA License and avoid its obligation to account for back royalties.

70.    The ODS Affiliates' false and misleading claims are likely to mislead and deceive the marketplace into contracting with the ODS Affiliates for replication services under the erroneous assumption that the replication activities are licensed through MPEG LA.

71.    MPEG LA has suffered, and, unless the ODS Affiliates are restrained and enjoined, will continue to suffer serious and material injury by reason of the false and misleading claims made by the ODS Affiliates about their status as licensees of MPEG LA.

**COUNT TWO**
**(DECLARATORY JUDGMENT REGARDING INVALID ASSIGNMENT)**

72.    There is an actual controversy between MPEG LA and defendants as to whether defendants have been assigned an MPEG-2 Patent Portfolio license.

73.    MPEG LA incorporates by reference the allegations set forth in paragraphs 1 through 65 of this Complaint as though fully set forth herein.

74.    The purported assignment of the License from Thamesdown to ODS BSL is invalid.

75.    Thamesdown had no License to assign.

76.    MPEG LA did not consent to such transfer of its License from Thamesdown to ODS BSL.

77.    The purported assignment of the License from DSML to ODS DSI is invalid.

78.    DSML had no License to assign.

79.    MPEG LA did not consent to such transfer of its License to ODS DSI.

80.    MPEG LA seeks a declaration that these putative assignments do not constitute valid assignments of a License with legal effect.

14

## COUNT THREE
### (DECLARATORY JUDGMENT REGARDING MPEG LA TERMINATED ANY LICENSE)

81.    There is an actual controversy between MPEG LA and defendants as to whether MPEG LA has terminated any license.

82.    MPEG LA incorporates by reference the allegations set forth in paragraphs 1 through 65 of this Complaint as though fully set forth herein.

83.    MPEG LA terminated the license to Thamesdown as of March 1, 2006, the date on which Thamesdown was placed into administration.  Section 6.5.1 of the MPEG-2 Patent Portfolio License provides for termination after a licensee files a petition for bankruptcy.

84.    On December 28, 2006, MPEG LA advised ODS BSL that Thamesdown's license had been terminated effective March 1, 2006.

85.    In the event any License was deemed nevertheless to have been transferred to ODS BSL because of its alleged acquisition of Thamesdown, MPEG LA terminated the license to ODS BSL as of December 28, 2006 pursuant to the License. (*See* Exhibit A hereto at Section 6.5.3.)

86.    DSML has never been licensed through MPEG LA.

87.    In the event any License was deemed nevertheless to have been transferred to  ODS DSI because of its alleged acquisition of DSML,  MPEG LA terminated the license to  ODS DSI as of January 8, 2007 pursuant to the License.  (*See* Exhibit A hereto at Section 6.5.3.)

88.    For foregoing reasons, MPEG LA seeks a declaration that these putative License acquisitions are void because of MPEG LA's termination of the Licenses.

15

<u>COUNT FOUR</u>
**(DECLARATORY JUDGMENT REGARDING NO LICENSE
FOR AFFILIATES OF ODS AFFILIATES)**

89.    There is an actual controversy between MPEG LA and defendants as to whether ODS Affiliates have been licensed.

90.    MPEG LA incorporates by reference the allegations set forth in paragraphs 1 through 65 of this Complaint as though fully set forth herein.

91.    ODS BSL claims that its unilateral decision to extend the putative License to certain of its affiliates is valid.

92.    ODS BSL purports to have effectuated this assignment on forms it created without the ratification or assent of MPEG LA.

93.    ODS ODS DSI claims that its unilateral decision to extend its putative License to certain of its affiliates is valid.

94.    ODS DSI purport to have effectuated this assignment on forms they created without the ratification or assent of MPEG LA.

95.    The purported extension of license coverage to the affiliates of the ODS Affiliates is invalid: a licensee can not extend License coverage to an affiliate by simpy creating and executing a form independent of any acceptance by MPEG LA.

96.    Pursuant to the License, a licensee may elect to include its affiliates within the scope of the license if, and only if, it "notifies the Licensing Administrator within ten (10) Days of the grant of such new further sublicense, and the attachment to the License held by MPEG LA entitled "Licensed Affiliates" is modified to include the new sublicensed Affiliate." (*See* Exhibit A hereto at Section 2.9.2 (*emphasis added*).)  This, obviously, cannot be accomplished without the assent of MPEG LA.

16

97. The ODS Affiliates failed to adhere to the terms of the License in their failed attempt to further sublicense certain of their Affiliates.

98. The ODS Affiliates neither sought nor received the assent of MPEG LA, a necessary component of any further sublicense of the License by a licensee to its Affiliates.

99. For foregoing reasons, MPEG LA seeks a declaration that the ODS Affiliates did not extend their putative License coverage to any affiliate and that therefore no affiliate of the ODS Affiliates is a licensee.

## DEMAND FOR PERMANENT INJUNCTION, DAMAGES AND DECLARATORY JUDGMENT

WHEREFORE, Plaintiff MPEG LA demands that the following relief be entered against the ODS Affiliates:

A. Declaring that the ODS Affiliates have violated section 43(b) of the Lanham Act (15 U.S.C. § 1125(a));

B. Preliminarily and permanently enjoining the ODS Affiliates from disseminating statements that they are licensed because of the alleged acquisitions discussed in the Complaint;

C. Awarding MPEG LA damages for the ODS Affiliate's unlawful conduct according to proof;

D. Awarding treble damages pursuant to 15 U.S.C. § 1117 for damages awarded under the Lanham Act;

E. Granting MPEG LA its costs and disbursements in this action, including its reasonable attorneys' fees;

17

F.    Declaring that the purported assignments of MPEG LA Licenses to the ODS Affiliates are void;

G.    Declaring that to the extent any license has been properly assigned, any such assigned license is terminated by MPEG LA pursuant to Section 6.5.3 of the License;

H.    Declaring that the purported assignments of MPEG LA Licenses to the affiliates of the ODS Affiliates are void; and

I.    Awarding MPEG LA such other and further relief that the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

OF COUNSEL:                                         POTTER ANDERSON & CORROON LLP

Garrard R. Beeney
Sullivan & Cromwell LLP                             By: /s/ Richard L. Horwitz
125 Broad Street                                        Richard L. Horwitz (#2246)
New York, New York 10004                                David E. Moore (#3983)
(212) 558-4000                                          Hercules Plaza, 6th Floor
                                                        1313 N. Market Street
Alexis DeVane                                           Wilmington, DE  19801
Sullivan & Cromwell LLP                                 Tel:  (302) 984-6000
1701 Pennsylvania Avenue, N.W.                          rhorwitz@potteranderson.com
Washington, DC 20006-5805                               dmoore@potteranderson.com
(202) 956-7500

                                                   Attorneys for Plaintiff MPEG LA, L.L.C.

Dated: January 17, 2007
772980 / 31121

# EXHIBIT A

**MPEG-2 PATENT PORTFOLIO LICENSE**

This Agreement is made this _____ day of _____ , by and between MPEG LA, L.L.C., a limited liability company of Delaware having a principal place of business in Greenwood Village, Colorado, U.S.A. (hereinafter "Licensing Administrator"); and _____, having a principal place of business at _____ _____ (hereinafter "Licensee").

**WHEREAS,** ISO/IEC JTC 1 and The International Telecommunications Union have jointly adopted an international standard relating to video data compression and data transport, formally known as ISO/IEC 13818-1 and 13818-2, and referred to in this Agreement as the "MPEG-2 Standard" (as more fully defined herein below);

**WHEREAS,** Canon Inc., a corporation of Japan, having a principal place of business in Tokyo, Japan; The Trustees of Columbia University in the City of New York, a not-for-profit corporation of New York, U.S.A., having a principal place of business in New York City, New York, U.S.A.; France Télécom, société anonyme, a corporation of France, having a principal place of business in Paris, France; Fujitsu Limited, a corporation of Japan, having a principal place of business in Kawasaki, Japan; GE Technology Development, Inc., a corporation of Delaware, U.S.A., having a principal place of business in Princeton, New Jersey, U.S.A; General Instrument Corporation, a corporation of Delaware, U.S.A., having a principal place of business in Horsham, Pennsylvania, U.S.A.; Hitachi, Ltd., a corporation of Japan, having a principal place of business in Tokyo, Japan; KDDI Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Koninklijke Philips Electronics N.V. ("PENV"), a corporation of The Netherlands, having a principal place of business in Eindhoven, The Netherlands, and U.S. Philips Corporation ("USPC"), a corporation of Delaware, U.S.A., having a principal place of business in Tarrytown, N.Y., U.S.A (PENV and USPC being hereinafter referred to, individually or collectively, as "Philips"); Matsushita Electric Industrial Co., Ltd., a corporation of Japan, having a principal place of business in Osaka, Japan; Mitsubishi Electric Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Nippon Telegraph and Telephone Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Samsung Electronics Co., Ltd., a corporation of Korea, having a principal place of business in Seoul, Korea; SANYO Electric Co., Ltd., a corporation of Japan, having a principal place of business in Osaka, Japan; Scientific-Atlanta, Inc., a corporation of Georgia, U.S.A., having a principal place of business in Norcross, Georgia, U.S.A.; Sony Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Toshiba Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; and Victor Company of Japan, Limited, a corporation of Japan, having a principal place of business in Yokohama, Japan (hereinafter collectively the "Licensors" or individually "Licensor," as more fully defined in this Agreement), each own and have the right to license, or have the right to sublicense one or more patents, utility models and/or allowed patent or utility model applications published for opposition which claim apparatus and/or methods necessary for compliance with the MPEG-2 Standard (hereinafter referred to as "MPEG-2 Essential Patent(s)");

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

**WHEREAS,** each Licensor believes that the MPEG-2 Standard represents a significant advance in the field of digital video data compression for transmission and storage, which will make available innovative new products and services to the public, and for this reason desires to encourage widespread adoption of the MPEG-2 Standard by video product and video service industries throughout the world;

**WHEREAS,** each Licensor has signed an ISO undertaking or hereby commits to make available licenses and/or sublicenses under any and all MPEG-2 Essential Patents licensable or sublicensable by the Licensor to any individual, company or other entity desiring such a license and/or sublicense on fair, reasonable and nondiscriminatory terms and conditions;

**WHEREAS,** each Licensor has granted the Licensing Administrator a worldwide, nonexclusive license and/or sublicense under all MPEG-2 Essential Patents licensable or sublicensable by the Licensor to allow the Licensing Administrator to grant worldwide, non-exclusive sublicenses under all such MPEG-2 Essential Patent(s) under the terms hereof;

**WHEREAS,** the Licensors desire to make available through the Licensing Administrator, license rights under their respective MPEG-2 Essential Patents in a single sublicense for the convenience of any individual, company or other entity desirous of acquiring such rights, thereby avoiding the need of such individual, company or other entity to obtain a separate license from each of the Licensors under its MPEG-2 Essential Patent(s);

**WHEREAS,** the Licensing Administrator desires to grant MPEG-2 Patent Portfolio Licenses to all individuals, companies and other entities desiring such a license under the terms and conditions set forth herein;

**WHEREAS,** nothing in this Agreement precludes the respective Licensors from licensing or sublicensing rights under individual MPEG-2 Essential Patent(s) to make, use, sell, or offer to sell products or processes including but not limited to the rights licensed in the MPEG-2 Patent Portfolio License;

**WHEREAS,** Licensee understands that this MPEG-2 Patent Portfolio License is offered for the convenience of Licensee and that Licensee is free to contact any Licensor to negotiate a license for any patent offered herein on terms and conditions different from those set forth herein which may be mutually acceptable to such Licensee and Licensor; and

**WHEREAS,** Licensee desires for its own convenience to obtain rights under the MPEG-2 Essential Patent(s) of all the Licensors in a single sublicense from the Licensing Administrator under the terms hereof.

**NOW, THEREFORE,** the Licensing Administrator AND Licensee AGREE AS FOLLOWS:

v1/1/02 rev1                                 2

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

0.    **EFFECTIVE DATE**

    **0.1**   This License Agreement shall be deemed effective as of June 1, 1994.

1.    **DEFINITIONS**

The definitions set forth in this Article shall apply to the following terms when used with initial capital letters in this Agreement, its attachments, and amendments hereto.

    **1.1**   **Affiliate** - shall mean a corporation, company, or other entity which now or hereinafter, directly or indirectly, controls, is controlled by or is under common control with a party. The term "control" as used in this Section 1.1 shall mean ownership of more than 50% of the outstanding shares representing the right to vote for directors or other managing officers of such corporation, company or other entity, or for a corporation, company or other entity which does not have outstanding shares, more than 50% of the ownership interest representing the right to make decisions for such corporation, company or other entity; provided, however, such corporation, company or other entity shall be deemed an Affiliate only so long as such "control" exists.

    **1.2**   **Agreement** - shall mean this sublicense between the Licensing Administrator and Licensee, including exhibits, attachments, amendments and modifications hereto.

    **1.3**   **Channel (Channels)** - shall mean a single path for transmitting signals, including by way of example and without limitation, a path which is separated from another path by frequency division or time division.

    **1.4**   **Confidential Information** - shall mean any information given to the Licensing Administrator pursuant to Article 5 of this Agreement which is designated "confidential" by Licensee.

    **1.5**   **Consumer Product** - shall mean a Licensed Product, which is not an MPEG-2 Intermediate Product, Sold directly to an end user primarily for personal, family, or household use, including without limitation a cable television "set top box", a direct satellite broadcast converter, and a personal computer having a manufacturer's suggested retail price of less than $15,000 U.S. or the equivalent in the currency of another country. For purposes of this Agreement, an MPEG-2 Packaged Medium shall not be considered a Consumer Product.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

    **1.6**    **Days** - shall mean calendar days unless otherwise specifically stated in this Agreement.

    **1.7**    **Licensed Product (Licensed Products)** - shall mean any product, including software, licensed under Article 2 of this Agreement.

    **1.8**    **Licensors (individually Licensor)** - shall mean Canon Inc.; The Trustees of Columbia University in the City of New York; France Télécom, société anonyme; Fujitsu Limited; GE Technology Development, Inc.; General Instrument Corporation; Hitachi Ltd.; KDDI Corporation; Koninklijke Philips Electronics N.V.; U.S. Philips Corporation; Matsushita Electric Industrial Co., Ltd.; Mitsubishi Electric Corporation; Nippon Telegraph and Telephone Corporation; Samsung Electronics Co., Ltd.; SANYO Electric Co., Ltd.; Scientific-Atlanta, Inc.; Sony Corporation; Toshiba Corporation; and Victor Company of Japan, Limited subject to additions and deletions from time to time, identified in Attachment 1 hereto.

    **1.9**    **Manufacture (Manufactured)** - shall mean fabrication, assembly, or otherwise making of substantially the entire finished MPEG-2 Royalty Product.

    **1.10**    **Movie** - shall mean a single motion picture as well as related video materials typically packaged with the motion picture including, without limitation, previews of other motion pictures, information about the making of the motion picture or the artists appearing therein. Movie shall not include a second motion picture regardless of whether such second motion picture is related to the first.

    **1.11**    **MPEG-1 Standard** - shall mean the MPEG-1 video standard as defined in ISO document IS 11172.

    **1.12**    **MPEG-2 Bundled Decoding Software** - shall mean (i) any storage medium, including by way of example and without limitation, magnetic tape, magnetic disk and CD ROM, storing an operating system having one or more computer programs for decoding video information in accordance with the MPEG-2 Standard, and which is Sold; or (ii) an operating system having one or more computer programs for decoding video information in accordance with the MPEG-2 Standard, and which is directly distributed to an end user through electronic communication means. For purposes of this Agreement, MPEG-2 Bundled Decoding Software licensed or sold to a computer manufacturer and loaded in a computer product Sold by the computer manufacturer shall be deemed an MPEG-2 Intermediate Product.

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

1.13    **MPEG-2 Bundled Encoding Software** - shall mean (i) any storage medium, incorporating an operating system having one or more computer programs for encoding video information into a format in compliance with the MPEG-2 Standard, and which is Sold, including by way of example and without limitation, magnetic tape, magnetic disk and CD ROM; or (ii) an operating system having one or more computer programs for encoding video information into a format in compliance with the MPEG-2 Standard, and which is directly distributed to an end user through electronic communication means. For purposes of this Agreement, MPEG-2 Bundled Encoding Software licensed or sold to a computer manufacturer and loaded in a computer product Sold by the computer manufacturer shall be deemed an MPEG-2 Intermediate Product.

1.14    **MPEG-2 Decoding Product** - shall mean any instrumentality or combination of instrumentalities, including by way of example and without limitation: a television receiver; cable, terrestrial broadcast and satellite broadcast receiving equipment; a computer card; a camcorder; video telecommunications equipment; video packaged media playback equipment; and video game equipment, which is primarily designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard, and which is Sold. For purposes of this Agreement, a computer or digital processor loaded with MPEG-2 Decoding Software or MPEG-2 Bundled Decoding Software shall be deemed an MPEG-2 Decoding Product.

1.15    **MPEG-2 Decoding Software** - shall mean: (i) any storage medium, including by way of example and without limitation, magnetic tape, magnetic disk and CD ROM, storing one or more computer programs designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard, and which is Sold; (ii) one or more computer programs designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard and which is directly distributed to an end user through electronic communication means; or (iii) one or more computer programs designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard that are included in an MPEG-2 Packaged Medium together with video information in a format in compliance with the MPEG-2 Standard. MPEG-2 Decoding Software shall not mean software which is part of an operating system. For purposes of this Agreement, MPEG-2 Decoding Software licensed or sold to a computer manufacturer and loaded in a computer product Sold by the computer manufacturer shall be deemed an MPEG-2 Intermediate Product.

1.16    **MPEG-2 Distribution Encoding Product** - shall mean an MPEG-2 Encoding Product which is primarily designed for encoding video information into a format in compliance with the MPEG-2 Standard and for commercial distribution of

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

such encoded video information, including by way of example and without limitation, distribution by terrestrial broadcast, satellite broadcast, and cable transmission. For purposes of this Section 1.16, the term "distribution" shall not be construed to include distribution by way of MPEG-2 Packaged Medium.

1.17    **MPEG-2 Encoding Product** - shall mean any instrumentality or combination of instrumentalities, including by way of example and without limitation, television signal transmitting equipment, a computer card, a camcorder, video telecommunications equipment and consumer video recording equipment, which is primarily designed in whole or in part for encoding video information into a format in compliance with the MPEG-2 Standard, and which is Sold. For purposes of this Agreement, a computer or digital processor loaded with MPEG-2 Encoding Software or MPEG-2 Bundled Encoding Software shall be deemed an MPEG-2 Encoding Product.

1.18    **MPEG-2 Encoding Software** - shall mean: (i) any storage medium, including by way of example and without limitation, magnetic tape, magnetic disk and CD ROM, storing one or more computer programs designed for encoding video information into a format in compliance with the MPEG-2 Standard, and which is Sold; or (ii) one or more computer programs designed for encoding video information in compliance with the MPEG-2 Standard, and which is directly distributed to an end user through electronic communication means. MPEG-2 Encoding Software shall not mean software which is part of an operating system. For purposes of this Agreement, MPEG-2 Encoding Software licensed or sold to a computer manufacturer and loaded in a computer product Sold by the computer manufacturer shall be deemed an MPEG-2 Intermediate Product.

1.19    **MPEG-2 Essential Patent** - shall mean any Patent claiming an apparatus and/or method necessary for compliance with the MPEG-2 Standard under the laws of the country which issued or published the Patent.

1.20    **MPEG-2 Intermediate Product** - shall mean any instrumentality or combination of instrumentalities, including by way of example and without limitation an integrated circuit chip or chip set, a subsystem circuit board(s), firmware, and software, which is primarily designed to be used, alone or with other instrumentalities, to encode or decode video information in a format in compliance with the MPEG-2 Standard, or to produce a transport stream or program stream in accordance with the MPEG-2 Standard, but which is not a product that is Sold.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

**1.21**  **MPEG-2 Packaged Medium (Media)** - shall mean any storage medium, including by way of example and without limitation magnetic tape, magnetic disk and optical disk, storing one or more MPEG-2 Video Events.

**1.22**  **MPEG-2 Patent Portfolio** - shall mean the portfolio of MPEG-2 Essential Patent(s) identified in Attachment 1 hereto, which portfolio may be supplemented or reduced from time to time in accordance with the provisions of this Agreement.

**1.23**  **MPEG-2 Patent Portfolio Patent** - shall mean an MPEG-2 Essential Patent under which a Licensor has the right to grant a license or sublicense to a third party with the right of such third party to grant sublicenses, and which is included in the MPEG-2 Patent Portfolio.

**1.24**  **MPEG-2 Related Patent** - shall mean any Patent which is not an MPEG-2 Essential Patent but which has one or more claims directed to an apparatus or a method that may be used in the implementation of a product or a service designed in whole or in part to exploit the MPEG-2 Standard under the laws of the country which issued or published the Patent.

**1.25**  **MPEG-2 Royalty Product** - shall mean a hardware and/or software product for which a royalty is payable to the Licensing Administrator hereunder.

**1.26**  **MPEG-2 Standard** - shall mean the MPEG-2 video standard as defined in ISO documents IS 13818-1 (including annexes C, D, F, J and K), IS 13818-2 (including annexes A, B, C and D, but excluding scalable extensions), and IS 13818-4 (only as it is needed to clarify IS 13818-2).

**1.27**  **MPEG-2 Transport or Program Stream Product** - shall mean any instrumentality or combination of instrumentalities for use alone or with other instrumentalities, which is primarily designed in whole or in part for generating and/or processing video information to provide an MPEG-2 transport stream or an MPEG-2 program stream as defined by the MPEG-2 Standard, and which is Sold. The term MPEG-2 Transport or Program Stream Product shall not be construed to include one or more MPEG-2 Encoding Products.

**1.28**  **MPEG-2 Video Event** - shall mean video information having a normal playing time of any length up to and including 133 minutes encoded into a format in compliance with the MPEG-2 Standard that comprises video programming, including by way of example and without limitation, one or more Movies, television shows, video games, video advertisements, music videos and short subject video clips, or any compilation of any of the foregoing.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

    **1.29**    **Patent** - shall mean any issued patent or issued utility model of any country, or any allowed patent application or allowed utility model application, published for opposition in any country.

    **1.30**    **Sale (Sold)** - shall mean any sale, rental, lease, license or other form of distribution of an MPEG-2 Royalty Product to an end user, either directly or through a chain of distribution. For purposes of this Agreement, a Sale under this Section 1.30 shall be deemed to take place in the country where an end user takes delivery of the MPEG-2 Royalty Product which is the subject of the "Sale," irrespective of the manner in which the "Sale" takes place.

    **1.31**    **White Book Standard** - shall mean the document entitled VIDEO CD Specification version 2.0, published by Philips Consumer Electronics B.V., and dated April, 1995.

**2.**    **LICENSING ADMINISTRATOR GRANT**

    **2.1**    **MPEG-2 Intermediate Products.** Subject to Paragraph 7.16.1 hereof and to the other terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-free, worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio, to make, have made, use only by Licensee solely for internal development and testing purposes, and sell, offer for sale or otherwise distribute, MPEG-2 Intermediate Products. NO LICENSE IS GRANTED HEREIN, BY IMPLICATION OR OTHERWISE, TO CUSTOMERS OF LICENSEE TO USE MPEG-2 INTERMEDIATE PRODUCTS MANUFACTURED OR SOLD BY LICENSEE.

    **2.2**    **MPEG-2 Decoding Products, MPEG-2 Decoding Software, and MPEG-2 Bundled Decoding Software.** Subject to the terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to make, have made, use, and sell, offer for sale or otherwise distribute MPEG-2 Decoding Products, MPEG-2 Decoding Software, and MPEG-2 Bundled Decoding Software.

    **2.3**    **MPEG-2 Encoding Products, MPEG-2 Distribution Encoding Products, MPEG-2 Encoding Software, and MPEG-2 Bundled Encoding Software.** Subject to Paragraph 7.16.2 hereof and to the other terms and conditions of this

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

        Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to make, have made, use for purposes other than encoding an MPEG-2 Video Event for recording on an MPEG-2 Packaged Medium, and sell, offer for sale or otherwise distribute MPEG-2 Encoding Products, MPEG-2 Distribution Encoding Products, MPEG-2 Encoding Software, and MPEG-2 Bundled Encoding Software. NO LICENSE IS GRANTED HEREIN, BY IMPLICATION OR OTHERWISE, TO CUSTOMERS OF LICENSEE TO USE MPEG-2 ENCODING PRODUCTS, MPEG-2 DISTRIBUTION ENCODING PRODUCTS, MPEG-2 ENCODING SOFTWARE, AND/OR MPEG-2 BUNDLED ENCODING SOFTWARE FOR ENCODING OR HAVING ENCODED ONE OR MORE MPEG-2 VIDEO EVENTS FOR RECORDING ON AN MPEG-2 PACKAGED MEDIUM FOR ANY USE OR DISTRIBUTION OTHER THAN PERSONAL USE OF LICENSEE'S CUSTOMER.

2.4    **MPEG-2 Packaged Medium.** Subject to the terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to use MPEG-2 Encoding Products, MPEG-2 Distribution Encoding Products, MPEG-2 Encoding Software, and/or MPEG-2 Bundled Encoding Software, for encoding or having encoded one or more MPEG-2 Video Events for recording on an MPEG-2 Packaged Medium, and to sell, offer for sale or otherwise distribute MPEG-2 Packaged Medium.

2.5    **MPEG-2 Transport or Program Stream Products.** Subject to the terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to make, have made, use except for the purpose of generating a program stream or transport stream for recording on an MPEG-2 Packaged Medium, and sell, offer for sale or otherwise distribute MPEG-2 Transport or Program Stream Products.

2.6    No license or immunity is granted by either party hereto to the other party hereto, either directly or by implication, estoppel or otherwise, other than as expressly provided in Sections 2.1 through 2.5, 2.9, 7.3 and 7.4 of this Agreement.

2.7    Except as provided in Section 2.9 of this Agreement, the sublicenses granted in Sections 2.1 to 2.5 of this Agreement do not include the right of the Licensee to grant any further sublicenses.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

2.8    IT IS UNDERSTOOD AND AGREED THAT ANY LICENSE GRANTED HEREIN SHALL NOT INCLUDE ANY RIGHT TO MAKE, HAVE MADE, USE, OR SELL ANY PRODUCT OR PROCESS CAPABLE OF COMPLYING SOLELY WITH THE MPEG-1 STANDARD AND NO OTHER PORTION OF THE MPEG-2 STANDARD, INCLUDING BUT NOT LIMITED TO A VIDEO-CD WHICH COMPLIES WITH THE WHITE BOOK STANDARD.

2.9    **Extension of Sublicense to Affiliates.**  The sublicenses granted herein by the Licensing Administrator shall include the right of Licensee to grant further sublicenses to its Affiliates, subject to the condition that any and all Affiliates of Licensee receiving such further sublicenses be identified in an attachment to this sublicense entitled "Licensed Affiliates."  Each sublicensed Affiliate shall be bound by the terms and conditions of this sublicense as if it were named herein in the place of the Licensee; provided, however that Licensee shall pay and account to the Licensing Administrator for royalties hereunder payable as a result of the activities of any and all sublicensed Affiliates.  Any sublicense granted to an Affiliate shall terminate automatically and without notice on the date such Affiliate ceases to be an Affiliate.

    2.9.1    **Notice to Licensing Administrator of Sublicense Termination.**  In the event that a sublicense to an Affiliate of Licensee is terminated either as a result of the Affiliate ceasing to be an Affiliate, or as a result of a termination of the sublicense of the Affiliate by Licensee, Licensee shall notify the Licensing Administrator of the termination within ten (10) Days of such termination, and the attachment entitled "Licensed Affiliates" shall be modified to reflect such termination of an Affiliate.

    2.9.2    **Notice to Licensing Administrator of New Sublicense.**  In the event that Licensee grants a new further sublicense to either a new Affiliate or an existing Affiliate not previously sublicensed, such new further sublicense shall be effective immediately upon the grant thereof; provided that Licensee notifies the Licensing Administrator within ten (10) Days of the grant of such new further sublicense, and the attachment entitled "Licensed Affiliates" is modified to include the new sublicensed Affiliate.

3.    **ROYALTY AND PAYMENTS**

3.1    **Royalty.**  Licensee shall pay to the Licensing Administrator for the benefit of Licensors a running royalty throughout the term of this Agreement as follows:

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

**3.1.1** **MPEG-2 Decoding Product, MPEG-2 Decoding Software, MPEG-2 Bundled Decoding Software.** The royalty for the sublicense granted pursuant to Section 2.2 hereof shall be four United States Dollars (U.S. $4.00) prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) thereafter upon the Sale of each end product Manufactured or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where the end product is:

    **3.1.1.1** An MPEG-2 Decoding Product;

    **3.1.1.2** A copy of MPEG-2 Decoding Software; or

    **3.1.1.3** A copy of MPEG-2 Bundled Decoding Software.

**3.1.2** **MPEG-2 Encoding Product, MPEG-2 Encoding Software, and MPEG-2 Bundled Encoding Software.** The royalty for the sublicense granted pursuant to Section 2.3 hereof shall be four United States Dollars (U.S. $4.00) prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) thereafter upon the Sale of each end product Manufactured or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where the end product is:

    **3.1.2.1** An MPEG-2 Encoding Product;

    **3.1.2.2** A copy of MPEG-2 Encoding Software; or

    **3.1.2.3** A copy of MPEG-2 Bundled Encoding Software.

**3.1.3** **MPEG-2 Distribution Encoding Product.** The royalty for the sublicense granted pursuant to Section 2.3 hereof shall be L times four United States Dollars (L x U.S. $4.00) prior to January 1, 2002, and L times two and one half United States Dollars (L x U.S. $2.50) thereafter upon the Sale of each MPEG-2 Distribution Encoding Product Manufactured or Sold as an end product in a country where one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where L is the number of Channels of the MPEG-2 Distribution Encoding Product for providing video information encoded in a format in compliance with the MPEG-2 Standard.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

    **3.1.4**    **Consumer Product.** The royalty for the sublicense granted pursuant to Sections 2.2 and 2.3 hereof for a single self-contained end product having both MPEG-2 encoding and decoding capabilities shall be limited to six United States Dollars (U.S. $6.00) prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) thereafter upon the Sale of each such end product Manufactured or Sold as a Consumer Product in a country where one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where the Consumer Product:

        **3.1.4.1**    Incorporates both an MPEG-2 Encoding Product and an MPEG-2 Decoding Product;

        **3.1.4.2**    Is a copy of software that is both MPEG-2 Encoding Software and MPEG-2 Decoding Software; or

        **3.1.4.3**    Is a copy of software that is both MPEG-2 Bundled Encoding Software and MPEG-2 Bundled Decoding Software.

    **3.1.5**    **MPEG-2 Transport or Program Stream Product.** The royalty for the sublicense granted pursuant to Section 2.5 hereof shall be N times four United States Dollars (N x U.S. $4.00) upon the Sale of each MPEG-2 Transport or Program Stream Product Manufactured or Sold as an end product in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where N is the greater of the number of input or output transport or program streams of the MPEG-2 Distribution Transport or Program Stream Product.

    **3.1.6**    **MPEG-2 Packaged Medium.** The royalty for the sublicense granted pursuant to Section 2.4 hereof upon the Sale of each copy of MPEG-2 Packaged Medium (manufactured or sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder is in force) containing one or more MPEG-2 Video Events encoded using an MPEG-2 Encoding Product, an MPEG-2 Distribution Encoding Product, MPEG-2 Encoding Software and/or MPEG-2 Bundled Encoding Software prior to September 1, 2001, shall be four United States Cents (U.S. $0.04) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium, plus one United States Cent (U.S. $0.01) for each additional 30 minutes of video playing time or portion thereof on the same MPEG-2 Packaged Medium. Notwithstanding the above, however, the royalty (i) shall not exceed four

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

United States Cents (U.S. $0.04) for a single Movie; (ii) shall not exceed an additional two United States Cents (U.S. $0.02) for the second Movie contained on the same MPEG-2 Packaged Medium as the first Movie; and (iii) shall be one United States Cent (U.S. $0.01) for each MPEG-2 Packaged Medium having a normal playing time up to and including 12 minutes, but not more than 12 minutes, of video programming on the same MPEG-2 Packaged Medium which is encoded into a format in compliance with the MPEG-2 Standard.

3.1.7    **MPEG-2 Packaged Medium**. For the period commencing as of September 1, 2001 and ending on February 28, 2003, the royalty for the sublicense granted pursuant to Section 2.4 hereof upon the Sale of each copy of MPEG-2 Packaged Medium (manufactured or sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force) containing one or more MPEG-2 Video Events encoded using an MPEG-2 Encoding Product, an MPEG-2 Distribution Encoding Product, MPEG-2 Encoding Software and/or MPEG-2 Bundled Encoding Software, shall be three and one half United States Cents (U.S. $0.035) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium, plus one United States Cent (U.S. $0.01) for each additional 30 minutes of video playing time or portion thereof on the same MPEG-2 Packaged Medium. Notwithstanding the above, however, the royalty (i) shall not exceed three and one half United States Cents (U.S. $0.035) for a single Movie; (ii) shall not exceed an additional two United States Cents (U.S. $0.02) for the second Movie contained on the same MPEG-2 Packaged Medium as the first Movie; and (iii) shall be one United States Cent (U.S. $0.01) for each MPEG-2 Packaged Medium having a normal playing time up to and including 12 minutes, but not more than 12 minutes, of video programming on the same MPEG-2 Packaged Medium which is encoded into a format in compliance with the MPEG-2 Standard.

3.1.8    **MPEG-2 Packaged Medium**. For the period commencing as of March 1, 2003 through the term of the License, the royalty for the sublicense granted pursuant to Section 2.4 hereof upon the Sale of each copy of MPEG-2 Packaged Medium (manufactured or sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force) containing one or more MPEG-2 Video Events encoded using an MPEG-2 Encoding Product, an MPEG-2 Distribution Encoding Product, MPEG-2 Encoding Software and/or MPEG-2 Bundled Encoding Software, shall be three United States Cents (U.S. $0.03) for the first MPEG-2 Video Event on any MPEG-2

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

Packaged Medium, plus one United States Cent (U.S. $0.01) for each additional 30 minutes of video playing time or portion thereof on the same MPEG-2 Packaged Medium. Notwithstanding the above, however, the royalty (i) shall not exceed three United States Cents (U.S. $0.03) for a single Movie; (ii) shall not exceed an additional two United States Cents (U.S. $0.02) for the second Movie contained on the same MPEG-2 Packaged Medium as the first Movie; and (iii) shall be one United States Cent (U.S. $0.01) for each MPEG-2 Packaged Medium having a normal playing time up to and including 12 minutes, but not more than 12 minutes, of video programming on the same MPEG-2 Packaged Medium which is encoded into a format in compliance with the MPEG-2 Standard.

3.1.9    Subject to Paragraph 3.1.4 of this Agreement, the royalties set forth in this Section 3.1 are additive as to each MPEG-2 Royalty Product to the extent that individual royalties are applicable thereto.

3.2    **The Payment of Running Royalties Upon the Sale of MPEG-2 Decoding Products, MPEG-2 Decoding Software, MPEG-2 Bundled Decoding Software, MPEG-2 Encoding Products, MPEG-2 Encoding Software or any Combination of the Above Sold in a Single Self-Contained Product (for purposes of this Section 3.2, "Product(s)").**

3.2.1    Royalties pursuant to this Article 3 are payable upon the Sale of:

3.2.1.1    Products which allow the end user to decode and/or encode (consistent with the limitations set forth in Section 2.3) MPEG-2 compliant bit streams; provided, however that no royalty shall be payable upon the Sale or distribution of such Products when the Product is incorporated with and used with an MPEG-2 Royalty Product on which a royalty already has been paid to the Licensing Administrator pursuant to Article 3 hereof.

3.2.1.2    Products in which the MPEG-2 functionality of the Product is encrypted, disabled or otherwise unusable only:

3.2.1.2.1 upon the distribution of a key or other instrumentality allowing the Product to be used to decode and/or encode MPEG-2 compliant bit streams; or

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

      **3.2.1.2.2** if the encryption, disablement or other method employed to prevent use is generally breached royalties for all such Products sold shall become payable pursuant to Article 3.

      **3.2.1.2.3** if Licensee fails to take reasonable steps to insure that the MPEG-2 functionality is encrypted, disabled or otherwise unusable, royalties for all such Products Sold shall become payable pursuant to Article 3.

**3.2.1.3** MPEG-2 Decoding Software updates and/or MPEG-2 Encoding Software updates; provided, however, that no royalty shall be due if such update (i) is Sold or distributed for use in connection with an MPEG-2 Royalty Product upon which a royalty has been paid to the Licensing Administrator in accordance with Article 3 and (ii) the update which is Sold or distributed overwrites or otherwise renders not usable the pre-existing MPEG-2 capability on the MPEG-2 Royalty Product which is upgraded.

**3.3** **Payment Schedule.**

**3.3.1** Except as provided in Section 3.4 hereof, royalties payable pursuant to Section 3.1 of this Agreement that accrue after the latest signature date specified on the final page of this Agreement shall be payable by Licensee to the Licensing Administrator semiannually as previously agreed between Licensee and the Licensing Administrator in the term prior to this Agreement, or if there was no prior term, as measured from such signature date to the last business day of each six month period thereafter for MPEG-2 Royalty Products Manufactured or Sold during the immediately preceding semiannual period ending on the last business day of the second month preceding the month when royalties are payable. Such royalties shall be paid to the Licensing Administrator and shall be accompanied by a statement pursuant to Section 3.9 of this Agreement, which statement shall be deemed to be true and correct unless shown otherwise in an audit in accordance with Section 3.10 of this Agreement.

**3.3.2** **Back Royalties.** Any royalties pursuant to the above schedule which accrued during the period from June 1, 1994 to the latest signature date specified above shall be payable within thirty (30) Days of such signature date, together with accrued interest of 10% per annum and shall

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

be accompanied by a royalty statement in accordance with Section 3.9 of this Agreement.

3.4 **Payments Upon Termination or Expiration.** Within thirty (30) Days after the effective date of termination or expiration of this Agreement, Licensee shall pay the Licensing Administrator any and all amounts that are due pursuant to this Agreement as of the effective date of such termination or expiration, together with a royalty statement for such payment in accordance with Section 3.9 of this Agreement.

3.5 **Form of Payment.** Any payment made under the provisions of this Agreement shall be made by check drawn on a bank(s) reasonably acceptable to the Licensing Administrator, by cashier's check drawn on immediately available funds, or by other means of payment acceptable to the Licensing Administrator.

3.5.1 The amounts payable hereunder shall be paid to the Licensing Administrator by the Licensee in United States Dollars.

3.6 **Taxes.** In addition to the royalties set forth in Section 3.1 of this Agreement, Licensee shall pay or reimburse the Licensing Administrator for any and all taxes, such as sales, excise, value added, use taxes, and similar taxes of the Licensee, based on payments to be made hereunder in a jurisdiction(s) where such taxes are required. The royalties set forth in Section 3.1 of this Agreement shall be subject to withholding of any taxes of the Licensor required by applicable law.

3.6.1 At the Licensee's request, the Licensing Administrator shall file any certificate or other document which may cause any tax that is so payable by the Licensee to be avoided or reduced.

3.6.2 The Licensee shall not be required to pay or reimburse the Licensing Administrator for taxes based upon the net worth, capital, net income, or franchise of the Licensing Administrator, nor taxes imposed upon the Licensing Administrator solely by reason of the Licensing Administrator's doing business in or being incorporated in the jurisdiction imposing such taxes.

3.6.3 The Licensee shall reasonably cooperate with the Licensing Administrator in respect of mitigating any withholding taxes, including providing such information as may be required by the Licensing Administrator for purposes of obtaining refunds of any taxes withheld.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

    **3.6.4**    The Licensing Administrator shall reasonably cooperate and provide such information as may be required by the Licensee for any purpose or reason relating to taxation.

    **3.6.5**    If the Licensee in good faith contests any tax that is so payable or reimbursable by the Licensee, the Licensing Administrator shall reasonably cooperate in such contest at the Licensee's expense.

    **3.6.6**    The Licensing Administrator shall pass on to the Licensee any tax refunds received by the Licensing Administrator with respect to the Licensee's previous payment or reimbursement of applicable taxes hereunder, if any.

**3.7**    **Late Payments.**  Any payment required hereunder that is made late (including unpaid portions of amounts due) shall bear interest, compounded monthly, at the lesser of 10% per annum or the highest interest rate permitted to be charged by the Licensing Administrator under applicable law.

    **3.7.1**    Any payment received more than fourteen (14) Days after becoming due as set forth in Section 3.3 of this Agreement shall be deemed late for purposes of this Agreement.

    **3.7.2**    Any interest charged or paid in excess of the maximum rate permitted by applicable law shall be deemed the result of a mistake and interest paid in excess of the maximum rate shall be promptly credited or refunded (at Licensee's option) to Licensee.

**3.8**    **Dishonored Checks.**  If a payment due under this Agreement is made by Licensee's check and the check is dishonored, the payment may at the Licensing Administrator's option be deemed not to have been made.  The Licensing Administrator may at its option, by written notice to Licensee, require subsequent payments to be made by cashier's check in immediately available funds.

**3.9**    **Statements.**  Licensee shall provide the Licensing Administrator with a statement for each period as defined in Sections 3.3.1, 3.3.2 and 3.4 showing in reasonable detail and separately identifying for each MPEG-2 Royalty Product both (i) the quantity Manufactured in each country and (ii) the quantity Sold in each country of any and all MPEG-2 Royalty Products Sold during such period by Licensee and its Affiliates, and a calculation of the royalties, if any, which are payable by virtue of such Manufacture and Sale of MPEG-2 Royalty Products during the period when the payment, if any, accrued.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

**3.9.1**   Such statements shall be certified by an employee of Licensee authorized to make such certification.

**3.9.2**   The Licensing Administrator shall maintain all information in such statements of Licensee as Confidential Information in accordance with Article 5 of this Agreement, except to the extent that the information is needed by the Licensing Administrator to report to the Licensors the aggregate royalties paid by all sublicensees of the Licensing Administrator. In no event shall the Licensing Administrator provide to any of the Licensors information on royalties paid on a licensee-by-licensee or country-by-country basis unless required by law.

**3.10**   **Audits.**

**3.10.1**   **Books and Records.** Licensee shall keep and maintain accurate and detailed books and records adequate for the Licensing Administrator to ascertain the royalties payable hereunder. Such books and records shall be maintained for three (3) years from the end of each period when royalties are payable.

**3.10.2**   **Audit Rights.** The Licensing Administrator shall have the right to audit or have audited the books and records of Licensee relating to payments hereunder for the sole purpose of verifying the amounts due and payable hereunder, not more than once per calendar year upon reasonable notice to the Licensee. All such audits shall be conducted during reasonable business hours of the Licensee.

**3.10.2.1**   Any such audit shall be performed by an independent certified public accountant(s) or equivalent (Auditor) reasonably acceptable to Licensee in the country where the audit is to take place. Licensee shall fully cooperate with Auditor in conducting such audit and shall permit Auditor to inspect and copy such portions of the Licensee's books and records that the Auditor deems appropriate and necessary in accordance with the professional standards applicable to the Auditor in the country where the Audit is to take place.

**3.10.2.2**   The Auditor (and each member or employee thereof participating in the audit) shall agree not to disclose any information learned by the Auditor in the audit to any Licensor, nor use any such information, except for providing

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

the Licensing Administrator with a statement of payments due by Licensee.

**3.10.2.3** The cost of an audit in accordance with Paragraph 3.10.2 of this Agreement shall be at the expense of the Licensing Administrator; provided, however, the Licensee shall bear the cost of the audit if the audit reveals any underpayment which in the aggregate is greater than five percent (5%) of the amount actually due for the period being audited.

**3.10.2.4** Licensee shall pay any shortfalls uncovered in accordance with Paragraph 3.10 of this Agreement, plus interest as set forth in Section 3.7 herein, within thirty (30) Days after receiving notice from the Licensing Administrator of such shortfall.

**4.    REPRESENTATIONS AND WARRANTIES**

**4.1**    The Licensing Administrator represents and warrants that it has the authority, power and right to grant the rights and licenses to Licensee under this Agreement.

**4.2**    The Licensing Administrator makes no representation or warranty that the MPEG-2 Patent Portfolio Patent(s) sublicensed hereunder includes all MPEG-2 Essential Patent(s) throughout the world, or that the making, using or selling of products, or providing services covered by the claims of the MPEG-2 Patent Portfolio Patent(s) licensed hereunder will not infringe, directly, contributorily or by inducement under the laws of the United States or under equivalents thereof under the laws of a country other than the United States, any patent or other intellectual property right of a party other than the MPEG-2 Patent Portfolio Patent(s).

**4.3**    Licensee represents and warrants that it is entering into this Agreement for its own convenience in acquiring patent rights necessary for compliance with the MPEG-2 Standard from multiple licensors in a single transaction rather than entering into separate license agreements with individual licensors, and that Licensee is fully aware that the patents in the MPEG-2 Patent Portfolio may not include all present and future MPEG-2 Essential Patent(s), and that this Agreement may not provide Licensee with all the patent rights needed to perform the activities contemplated by Licensee in entering into this Agreement.  The Licensing Administrator and Licensee recognize that Licensee has the right to separately negotiate a license with any or all of the Licensors under any and all of

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

the MPEG-2 Patent Portfolio Patents under terms and conditions to be independently negotiated by each Licensor.

4.4      Licensee represents and warrants that it has not granted an exclusive license under an MPEG-2 Essential Patent owned by Licensee and has not assigned an MPEG-2 Essential Patent in anticipation of entering into this Agreement. Notwithstanding anything to the contrary in this Agreement, Licensors reserve the right to grant to Licensing Administrator an exclusive license under any MPEG-2 Patent Portfolio Patent with respect to any particular party.

4.5      Each party represents and warrants that it will comply with all applicable laws, regulations or ordinances pertaining to its performance hereunder.

4.6      Each party represents and warrants that this Agreement and the transactions contemplated hereby do not violate any agreements each party has with its agents, employees, or Affiliates or third parties.

4.7      Each party further represents and warrants that in executing this Agreement, it does not rely on any promises, inducements, or representations made by any party or third party with respect to this Agreement or any other business dealings with any party or third party, now or in the future.

4.8      Each party represents and warrants that it is not presently the subject of a voluntary or involuntary petition in bankruptcy or the equivalent thereof, does not presently contemplate filing any such voluntary petition, and does not presently have reason to believe that such an involuntary petition will be filed against it.

4.9      Other than the express warranties of this Article, there are NO OTHER WARRANTIES, EXPRESS OR IMPLIED.

5.      **CONFIDENTIAL INFORMATION**

5.1      For a period of five (5) years as measured from the first date of disclosure pursuant to this Agreement, the Licensing Administrator agrees to use reasonable care and discretion, at least commensurate with that degree of care it uses to protect similar information of its own, to avoid disclosure, publication, or dissemination of received Confidential Information, outside of those employees or consultants of the Licensing Administrator who have a need to know Confidential Information.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

5.2    Disclosure by the Licensing Administrator of Confidential Information under Section 5.1 of this Agreement shall be permitted in the following circumstances; provided, that the Licensing Administrator shall have first given reasonable notice to Licensee that such disclosure is to be made:

    5.2.1    In response to an order of a court or other governmental body;

    5.2.2    Otherwise required by law; or

    5.2.3    Necessary to establish rights under this Agreement.

5.3    Notwithstanding any other provisions of this Agreement, the obligations specified in Section 5.1 of this Agreement will not apply to any information that:

    5.3.1    Is or becomes publicly available without breach of this Agreement; or

    5.3.2    Is released for disclosure by written consent of the Licensee.

6.    **TERM AND TERMINATION**

6.1    **Term and Certain Royalty Rates on Renewal.** This Agreement shall expire on December 31, 2010. Upon expiration, Licensee shall have the right to renew this sublicense for successive five year periods for the life of any MPEG-2 Patent Portfolio Patent, subject to reasonable amendment of the royalty terms and rates set forth in this sublicense. Such reasonable amendment may take into account prevailing market conditions, changes in technological environment, and available commercial products at the time of each five year renewal. In no event shall the royalty rates upon each renewal of this sublicense increase, if at all, by more than 25% of the royalty rates set forth in this sublicense immediately prior to renewal. The preceding sentence, however, shall not apply to the Licensing Administrator's request at the time of renewal that royalty rates for MPEG-2 Packaged Media which ultimately are offered for rental to consumers be higher than royalty rates for MPEG-2 Packaged Media set forth in this sublicense at the time of renewal. Such request for higher royalty rates shall only be made by the Licensing Administrator, if at all, in the event that the majority of Licensees which are unaffiliated with entities which own copyrights on Movies charge different rates for replication of MPEG-2 Packaged Media depending on whether such MPEG-2 Packaged Media is offered to consumers for sale or rental.

6.2    **Termination for Material Breach.** The Licensing Administrator shall have the right to terminate this Agreement upon breach of a material provision thereof by

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

the Licensee. Such termination for material breach shall become effective upon the Licensing Administrator sending written notice to the Licensee specifying the breach, and the failure of the Licensee to demonstrate, to the satisfaction of the Licensing Administrator, that Licensee has cured such breach within sixty (60) Days of the sending of such notice. The following are examples of acts or omissions which constitute a material breach of this Agreement:

    **6.2.1**    Failure of the Licensee to make payments and provide statements in accordance with Sections 3.2, 3.3 and 3.9 of this Agreement;

    **6.2.2**    Failure of the Licensee to maintain adequate books and records in accordance with Paragraph 3.10.1 of this Agreement or to permit an audit in accordance with Paragraph 3.10.2 of this Agreement; or

    **6.2.3**    Failure of the Licensee to grant licenses to MPEG-2 Essential Patent(s) licensable or sublicensable by Licensee in accordance with Sections 7.3 or 7.4 of this Agreement.

    **6.2.4**    The foregoing list is by way of example and not limitation.

**6.3**    **Partial Termination in the Event of Litigation.** The Licensing Administrator, upon the instruction of a Licensor, shall terminate Licensee's sublicense under any MPEG-2 Patent Portfolio Patent(s) licensed or sublicensed to the Licensing Administrator by such Licensor in the event that the Licensee has brought a lawsuit or other proceeding for infringement of an MPEG-2 Related Patent(s) and/or an MPEG-2 Essential Patent(s) against such Licensor, and Licensee has refused to grant the Licensor a license on fair and reasonable terms and conditions under the MPEG-2 Related Patent(s) and/or MPEG-2 Essential Patent(s) upon which the lawsuit or other proceeding is based. For purposes of this Section 6.3 only, the Licensor's per patent share of royalties payable pursuant to Section 3.1 of this Agreement shall be presumed to be a fair and reasonable royalty rate for Licensee's Patent(s) considering the essential nature of Licensor's Patent(s) licensed hereunder.

**6.4**    **Voluntary Termination.** Licensee may terminate this Agreement by providing thirty (30) Days written notice to the Licensing Administrator.

**6.5**    **Other Terminations.** This Agreement may be terminated by the Licensing Administrator upon the occurrence of the following events:

    **6.5.1**    If Licensee files a petition in bankruptcy or the equivalent thereof, or is the subject of an involuntary petition in bankruptcy that is not dismissed

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

within sixty (60) Days after the filing date thereof, or is or becomes insolvent, or admits of a general inability to pay its debts as they become due.

6.5.2     Upon the de facto or de jure nationalization or expropriation of Licensee by governmental or military action, whether or not with valid authority.

6.5.3     Upon any failure by Licensee to provide, within thirty (30) Days after written notice from the Licensing Administrator, satisfactory and adequate assurances that Licensee is able and willing to fully and effectively perform its obligations under this Agreement.

6.5.4     In the event that any of the events listed in Sections 6.5.1, 6.5.2 or 6.5.3 hereof occur, this Agreement may be terminated by the Licensing Administrator upon thirty (30) Days written notice to Licensee, without right to cure.

6.6     **Survival.** The following provisions of this Agreement shall survive expiration or termination of this Agreement:

6.6.1     The obligation of Licensee to pay all royalties accrued as of the effective date of expiration or termination pursuant to Section 3.4 hereof;

6.6.2     The obligation of Licensee to provide statements under Section 3.9 of this Agreement; and

6.6.3     The obligation of the Licensing Administrator to maintain confidentiality under Article 5 of this Agreement.

7.     **MISCELLANEOUS PROVISIONS**

7.1     **Assignment.**

7.1.1     In the event that the right of the Licensing Administrator to grant MPEG-2 Patent Portfolio Licenses is transferred to a successor Licensing Administrator, this Agreement shall be deemed assigned to the successor Licensing Administrator.

7.1.2     This Agreement may not be assigned by the Licensee, other than to a successor of the entire interest of an Affiliate or business division of Licensee manufacturing or selling Licensed Products, or providing a

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

service in compliance with the MPEG-2 Standard, or to a purchaser of substantially all of the assets of Licensee or such Affiliate or business division thereof.

**7.2    Notice.**

**7.2.1**    All notices required or permitted under this Agreement shall be sent by either Certified Mail with return receipt requested, overnight delivery by commercial or other service which can verify delivery, fax to the number indicated herein, or by e-mail to the address indicated herein. Such notice so sent shall be effective as of the date it is sent. Notwithstanding anything to the contrary herein, amendments to Attachment 1 hereto, if any, shall be effective upon the posting of the new Attachment 1 on the website of the Licensing Administrator and such posting shall constitute notice pursuant to this Section.

**7.2.2**    All notices from the Licensing Administrator to Licensee shall be sent to:

Name: _____
Title: _____
Company: _____
Address: _____
_____
_____

Tel: _____
Fax: _____
E-mail: _____

CC:

Name: _____
Title: _____
Company: _____
Address: _____
_____
_____

Tel: _____
Fax: _____
E-mail: _____

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

    **7.2.3**  All notices from the Licensee to the Licensing Administrator or its successor shall be sent to:

        Contract Administrator
        MPEG LA, L.L.C.
        6312 S. Fiddler's Green Circle, Suite 400E
        Greenwood Village, CO  80111 USA
        Tel:  303-331-1880
        Fax:  303-331-1879
        E-mail:  Contractadministrator@mpegla.com
        Website:  www.mpegla.com

**7.3**  **Licensee Grant.**  Licensee agrees to grant a worldwide, nonexclusive license and/or sublicense under any and all MPEG-2 Essential Patent(s) that Licensee or its Affiliate(s), if any, has the right to license and/or sublicense, to any Licensor or any sublicensee of the Licensing Administrator desiring such a license and/or sublicense on fair and reasonable terms and conditions.  For purposes of this Section 7.3 only, the Licensors' per patent share of royalties payable pursuant to Section 3.1 of this Agreement shall be presumed to be a fair and reasonable royalty rate for the aforementioned license and/or sublicense to be granted by the Licensee.

    **7.3.1**  Licensee's obligation to grant licenses and/or sublicenses pursuant to Section 7.3 of this Agreement shall be effective upon execution of this Agreement.

**7.4**  **Licensee's Option.**  In lieu of Section 7.3 Licensee shall have the option to hereby grant a worldwide, nonexclusive, nontransferable, except to a successor Licensing Administrator, license and/or sublicense under any and all of its MPEG2 Essential Patent(s) to the Licensing Administrator with the right by the Licensing Administrator to grant MPEG-2 Patent Portfolio Licenses that include the MPEG-2 Essential Patent(s) that Licensee or its Affiliate(s), if any, has the right to license or sublicense.  Licensee shall identify to the Licensors any and all of its patents and patents of its Affiliate(s), if any, which Licensee believes in good faith to be MPEG-2 Essential Patent(s).  Licensors shall determine whether each of the patent(s) identified by Licensee is an MPEG2 Essential Patent(s) according to an established procedure applicable to all new patents identified to the Licensors.  The terms and conditions of the license and/or sublicense granted by the Licensee to the Licensing Administrator under this Section 7.4 shall be identical to the terms and conditions of the license and/or sublicense granted by

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

each Licensor to the Licensing Administrator.  If Licensee elects the option set forth in this Section 7.4, it shall be required to enter into an agreement referred to as the "Agreement Among Licensors," which has been entered into by all Licensors.

**7.5    Licensee Covenants.**

    **7.5.1**    Licensee hereby covenants to promptly notify the Licensing Administrator in the event that any allowed patent application(s) published for opposition, which is licensed or sublicensed to the Licensing Administrator pursuant to Section 7.4 of this Agreement as an MPEG-2 Essential Patent(s), does not issue as an MPEG-2 Essential Patent(s).

    **7.5.2**    Licensee shall promptly identify to the Licensing Administrator each patent(s), except for MPEG-2 Patent Portfolio Patents of the Licensors, licensable or sublicensable by Licensee or its Affiliate(s), if any, which Licensee believes in good faith to be an MPEG-2 Essential Patent(s) within fourteen (14) Days of execution of this Agreement.

    **7.5.3**    In the event that Licensee has granted an exclusive license to a third party under an MPEG-2 Essential Patent(s) prior to the date of execution of this Agreement, Licensee shall advise the Licensing Administrator of such an exclusive license and identify to the Licensing Administrator such third party.

**7.6    Licensing Administrator Covenants.**

    **7.6.1**    The Licensing Administrator covenants that if during the term of this Agreement, it acquires rights to grant sublicenses under additional MPEG-2 Essential Patent(s), the MPEG-2 Patent Portfolio License herein will be supplemented to include such additional MPEG-2 Essential Patent(s).

    **7.6.2**    The Licensing Administrator covenants that, with the exception of partial termination under Section 6.3 of this Agreement, any deletion from the MPEG-2 Patent Portfolio shall occur only upon a determination by the Licensors, or upon a final adjudication of a tribunal of competent jurisdiction from which no appeal is taken or allowed, that the deleted Patent(s) is invalid or unenforceable in the country which issued or published the Patent(s), and that any addition to the MPEG-2 Patent Portfolio shall occur only upon the determination by the Licensors that

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

the additional Patent(s) is an MPEG-2 Essential Patent(s) in the country which issued or published the Patent(s).

7.6.3    The Licensing Administrator further covenants that if any Patent(s) in the MPEG-2 Patent Portfolio is found not to be an MPEG-2 Essential Patent(s) in the country which issued or published the Patent(s), either by the Licensors or upon a final adjudication of a tribunal of competent jurisdiction from which no appeal is taken or allowed and such Patent(s) is to be deleted from the MPEG-2 Patent Portfolio, the Licensing Administrator shall give notice to Licensee of such deletion, and Licensee shall have the option to retain its sublicense under the deleted Patent(s) for the remainder of the term of this Agreement, including any renewal pursuant to Section 6.1 hereunder.

7.6.4    The Licensing Administrator covenants that it shall not delete from or add to the MPEG-2 Patent Portfolio for reasons other than stated in Paragraphs 7.6.1 and 7.6.2 and Section 6.3 herein.

7.6.5    The Licensing Administrator covenants that the royalties set forth in Section 3.1 of this Agreement shall not increase during the term of this Agreement, as set forth in Article 6 of this Agreement.

7.7    **Most Favorable Royalty Rates.**  Except as provided in Paragraph 7.7.1 of this Agreement, in the event that the Licensing Administrator grants an MPEG-2 Patent Portfolio License to another party with royalty rates more favorable than those set forth in Section 3.1 of this Agreement, whether or not such more favorable royalty rates are on terms and/or conditions that are different than those set forth herein, the Licensing Administrator shall send written notice to Licensee specifying the more favorable royalty rates and any terms and/or conditions that are different than those set forth herein within thirty (30) Days of the granting of the MPEG-2 Patent Portfolio License providing for such more favorable royalty rates. Licensee shall be entitled to an amendment of this Agreement to the extent of providing for royalty rates as favorable as that available to such other party within thirty (30) Days of sending written notice to the Licensing Administrator requesting such amendment; provided, however, that this Agreement shall also be amended to include any additional benefits to the Licensing Administrator. Any amendment made pursuant to this Section 7.7 shall be effective as of the date it is made, and such more favorable royalty rates shall not be retroactively applicable in favor of the Licensee, and shall not be a basis for claiming any refund of royalties paid prior to such effective date.

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

**7.7.1** Section 7.7 shall not apply to:

  **7.7.1.1** Settlement of litigation;

  **7.7.1.2** Determination by the Licensing Administrator of back royalties owed by a sublicensee;

  **7.7.1.3** Compromise or settlement of royalty payments owed by a sublicensee in financial distress;

  **7.7.1.4** Individual licenses or sublicenses granted by a Licensor to a third party;

  **7.7.1.5** An order of a court or an administrative body; and

  **7.7.1.6** An unauthorized act of the Licensing Administrator.

**7.8** **Freedom of Independent Development.**  Nothing in this Agreement shall be construed as prohibiting or restricting Licensee from independently developing competitive video products or video services.

**7.9** **Relationship.**  Nothing in this Agreement shall be construed to create a principal-agent relationship, partnership or joint venture between the parties, or give rise to any fiduciary duty from one party to the other party.

**7.10** **Severability.**  If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable or contrary to law, the remaining provisions of the Agreement will remain in full force and effect.

**7.11** **No Waiver.**  The failure of either party at any time to require performance by the other party of any provision of this Agreement shall not be construed as acquiescence or waiver of such failure to perform such provision.  The failure of either party to take action upon the breach of any provision of this Agreement shall not be construed as acquiescence or waiver of any such breach.

**7.12** **Binding on Successors.**  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns to the extent assignment is permitted by this Agreement.

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

7.13 **Article and Section Headings.** The Article and Section headings contained in this Agreement are for reference purposes only and shall not in any way control the meaning or interpretation of this Agreement.

7.14 **Representation of Counsel; Mutual Negotiation.** Each party has been represented by counsel of its choice in negotiating this Agreement. This Agreement shall therefore be deemed to have been negotiated at arms length, with the advice and participation of counsel, and prepared at the joint request, direction, and instruction of the parties, and shall be interpreted in accordance with its terms without favor to any party.

7.15 **English Language.** The parties have required that this Agreement and all documents relating thereto be drawn up in English.

7.16 **Notice to Customers.**

7.16.1 **MPEG-2 Intermediate Products Notice:** Licensee agrees to provide to its customers or any other party that receives from it an MPEG-2 Intermediate Product licensed under Section 2.1 of this Agreement a notice which specifies that: **"USE OF THIS PRODUCT IN ANY MANNER THAT COMPLIES WITH THE MPEG-2 STANDARD IS EXPRESSLY PROHIBITED WITHOUT A LICENSE UNDER APPLICABLE PATENTS IN THE MPEG-2 PATENT PORTFOLIO, WHICH LICENSE IS AVAILABLE FROM MPEG LA, L.L.C., 250 STEELE STREET, SUITE 300, DENVER, COLORADO 80206."**

Licensee understands that the license granted pursuant to Section 2.1 of this Agreement is conditioned on the Licensee providing the notice specified in this Section.

7.16.2 **MPEG-2 Packaged Media Notice:** Licensee agrees to provide to its customers or any other party that receives from it an MPEG-2 Encoding Product, an MPEG-2 Distribution Encoding Product, MPEG-2 Encoding Software or MPEG-2 Bundled Encoding Software licensed under Section 2.3 of this Agreement a notice which specifies that: **"ANY USE OF THIS PRODUCT OTHER THAN CONSUMER PERSONAL USE IN ANY MANNER THAT COMPLIES WITH THE MPEG-2 STANDARD FOR ENCODING VIDEO INFORMATION FOR PACKAGED MEDIA IS EXPRESSLY PROHIBITED WITHOUT A LICENSE UNDER APPLICABLE PATENTS IN THE MPEG-2 PATENT PORTFOLIO, WHICH LICENSE IS AVAILABLE**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

> **FROM MPEG LA, L.L.C., 250 STEELE STREET, SUITE 300,**
> **DENVER, COLORADO 80206."**
>
> Licensee understands that the license granted pursuant to Section 2.3 of
> this Agreement is conditioned on the Licensee providing the notice
> specified in this Section.

**7.17   Bankruptcy.**

   **7.17.1**  In the event that the Licensing Administrator should file a petition under
   the federal bankruptcy laws, or that an involuntary petition shall be filed
   against the Licensing Administrator, the parties intend that Licensee shall
   be protected in the continued enjoyment of its rights as licensee under the
   MPEG-2 Patent Portfolio Patents sublicensed hereunder to the maximum
   feasible extent including, without limitation, if it so elects, the protection
   conferred upon licensees under 11 U.S.C. Section 365(n).  The Licensing
   Administrator agrees that it will give Licensee notice of the filing of any
   voluntary or involuntary petition under the federal bankruptcy laws.

   **7.17.2**  The MPEG-2 Patent Portfolio Patents sublicensed hereunder shall be
   deemed to be "intellectual property" as the term is defined in 11 U.S.C.
   Section 101(35A).  All written agreements entered into in connection
   with the parties' performances hereunder from time to time shall be
   considered agreements "supplementary" to this Agreement for purposes
   of said Section 365(n).

**7.18   Choice of Law.**  The validity, construction and performance of this Agreement
shall be governed by the substantive law of the State of New York, United States
of America, without regard to the conflict of law rules in the jurisdiction where a
claim arising from this Agreement is brought.

**7.19   No Third Party Beneficiaries.**  Nothing in this Agreement shall be construed to
give rise to any obligation on either party hereto for the benefit of a third party
other than the Licensors or to confer any rights on any third party other than the
Licensors.

**7.20   Entire Agreement.**

   **7.20.1**  The provisions of this Agreement, including its attachments and any
   amendments, constitute the entire agreement between the parties, and
   supersede any and all prior communications and understandings, oral or
   written, between the parties relating to the subject matter hereof.

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

7.20.2   Except for supplementation of or deletion from the MPEG-2 Patent Portfolio by the Licensing Administrator, no amendment of this Agreement shall be effective unless such amendment is in writing and specifically references this agreement, and is signed by all parties hereto. The Licensing Administrator shall promptly notify Licensee of any supplementation of or deletion from the MPEG-2 Patent Portfolio.

7.21   **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## 8.    USE OF MPEG LA, L.L.C. NAME AND LOGO

Subject to the written approval of the Licensing Administrator, which approval shall not be unreasonably withheld:   (1) Licensee shall have the right to indicate on or in connection with its MPEG-2 Royalty Products licensed hereunder that such products are licensed by the Licensing Administrator, and (2) Licensee shall have the right to use an MPEG LA, L.L.C. logo on or in connection with its MPEG-2 Royalty Products licensed hereunder.

(Licensee)

Date: _____          By: _____

MPEG LA, L.L.C.

Date: _____          By: _____
                                      Lawrence A. Horn
                                      Manager & CEO

JS 44  (Rev. 3/99)                          **CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

MPEG LA, L.L.C.

**DEFENDANTS**

ODS OPTICAL DISC SERVICE, INC.
(f/k/a ODS BUSINESS SERVICES, INC.); and
ODS BUSINESS SERVICES, LTD.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, DE  19899-0951

Attorneys (If Known)

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury— Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>Habeas Corpus:<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☒ 890 Other Statutory Actions |

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

| | |
|---|---|
| ☒ 1  Original Proceeding | ☐ 2  Removed from State Court | ☐ 3  Remanded from Appellate Court | ☐ 4  Reinstated or Reopened | ☐ 5  Transferred from another district (specify) | ☐ 6  Multidistrict Litigation | ☐ 7  Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

Cause of action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Lanham Act, §§ 43 (a) and 43(b); 15 U.S.C. § 1125(a); 28 U.S.C. §§ 1331 and 1367.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE
01/17/2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse  (Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.**     **(a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

    (b.) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

    (c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States, are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.**     **Residence (citizenship) of Principal Parties.**  This section of the JS-44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**     **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.**     **Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**     **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.**     **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**     **Related Cases.**  This section of the JS-44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 7 -  3 3

## ACKNOWLEDGMENT
## OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ 3 _____ COPIES OF AO FORM 85.

JAN 1 7 2007
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Matthew D. Gordon
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action